1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   VICTOR GUERRERO,                           Case No.   1:16-cv-01433-LJO-JDP (HC)

12                      Petitioner,             FINDINGS AND RECOMMENDATIONS
                                                THAT COURT DENY PETITION FOR WRIT
13        v.                                    OF HABEAS CORPUS

14   W.L. MUNIZ,                                ECF No. 1

15                      Respondent.             OBJECTIONS DUE IN 14 DAYS

16

17        Petitioner Victor Guerrero, a state prisoner without counsel, seeks a writ of habeas corpus

18   under 28 U.S.C. § 2254.  ECF No. 1.  Petitioner challenges several parts of the jury instructions

19   given at his trial.  However, petitioner's claims are incognizable under federal law, and the

20   alleged errors were harmless.  We therefore recommend that the court deny the petition.

21   **I.    Background**

22        This case has its origins in a conspiracy to commit robbery that resulted in murder.

23   According to the government, two women lured two men to an alley.  Petitioner and another man,

24   who were waiting in the alley, then attempted to rob the two victims.  The robbery attempt went

25   wrong when the victims resisted.  Petitioner shot the resisting victim, and the other victim was

26   stabbed by one of the four perpetrators.  The victim shot by petitioner died.  The government

27   argued that the killing of one victim and injury of the other were natural and probable

28   consequences of petitioner and the other perpetrators' conspiracy to commit robbery.  A jury

                                            1

found petitioner guilty of conspiracy to commit robbery, first-degree felony murder, attempted murder, second-degree robbery, and attempted second-degree robbery.  CT 2:387-90, 406.[1]  The Fresno County Superior Court sentenced petitioner to life in prison without the possibility of parole.  CT 2:574-75, 579-82.

We set forth below the facts of the underlying offenses, as stated by the California Court of Appeal, Fifth District ("Court of Appeal").  A presumption of correctness applies to these facts.  *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

> On the evening of June 5, 2010, Juan Gonzalez (Gonzalez), Jose Jacobo (Jacobo), and Teofilo Mendoza (Mendoza) were leaving a bar when they met 18-year-old Princess Hernandez (Hernandez) and 20-year-old Sonia "Lil' One" Miranda (Miranda).  They drove the two young women back to Gonzalez's apartment, where they drank beer and used drugs.  In the early morning hours of June 6, 2010, the young women asked the men for a ride home.  Gonzalez drove Jacobo and the two young women to an alley in west Fresno based on their directions about where to leave them.  As the women walked away from Gonzalez's car, two suspects suddenly appeared in the alley, accosted Gonzalez and Jacobo, and demanded their wallets. Gonzalez and Jacobo resisted.  Gonzalez was fatally shot in the head and Jacobo was stabbed multiple times.  The suspects fled and Jacobo staggered into the street for help.

> The investigation revealed the two suspects in the alley were Victor "Mousie" Guerrero (Guerrero) and Juan "Pelon" Sanchez (Sanchez); that Guerrero shot Gonzalez and Sanchez stabbed Jacobo; and the alley was very near Francisco "Cisco" Gutierrez's (Gutierrez) apartment.  Several hours before the robbery and murder, Hernandez, Miranda, Guerrero and Sanchez had been at a party at Gutierrez's apartment, where they discussed a plan for the two young women to go to a bar, meet some men at random, get money and/or drugs from them, lure the victims outside, and Guerrero and Sanchez would rob them.

> Hernandez and Miranda later offered conflicting evidence whether Gutierrez had participated in or knew about the plan.  However, they testified Amy "Clumsy" Cabbel (Cabbel) drove Guerrero, Sanchez, and the two young women to a bar, and Cabbel gave them further instructions while they were in her car.  Shortly after Gonzalez's body was found in the alley, his cell phone was used to call the cell phone numbers for Cabbel and her boyfriend.

> . . .

---

[1] All "CT" citations refer to the clerk's transcript.  All "RT" citations refer to the reporter's transcript.

2

The chief prosecution witnesses were Hernandez, Miranda, and Gutierrez. Hernandez and Miranda were initially charged with the same offenses as defendants, but they pleaded guilty to conspiracy to commit robbery and voluntary manslaughter, pursuant to an agreement to testify truthfully for the prosecution, after which they would be sentenced to 11 years in prison. The plea agreement was not contingent on the conviction of Guerrero or anyone else for the crimes.

During the investigation, Gutierrez was detained while wearing shoes that contained Gonzalez's blood, Gonzalez's vehicle registration was found in Gutierrez's apartment, and Gutierrez eventually admitted that he moved Gonzalez's car away from his apartment building. Gutierrez was not charged with any offenses arising from this case, and there is no evidence he received any benefits for his testimony.

Sanchez was never found, and the police believed he escaped to Mexico.

. . .

### *Gutierrez's apartment*

Francisco "Cisco" Gutierrez lived in a first-floor apartment on East Amador Street in west Fresno. Gutierrez testified he was a "recreational" user of marijuana and methamphetamine. He used the drugs every day so he could stay high.

Gutierrez testified that defendant Victor "Mousie" Guerrero lived with him.

Hernandez and Miranda occasionally stayed at Gutierrez's apartment. At the time of the murder, Hernandez was 18 years old and Miranda was 20 years old. Hernandez and Miranda testified they were addicted to methamphetamine, and Gutierrez supplied them with drugs. Gutierrez allowed Hernandez and her two-year-old child to stay with him since her family threw her out because of her drug addiction.

Hernandez and Miranda testified they used to see Guerrero and Julio "Pelon" Sanchez at Gutierrez's apartment.

Rosalinda Gonzalez, who lived in the same apartment complex as Gutierrez, testified there were several people living or staying with him, including Guerrero, Sanchez, and some young women.

Hernandez testified she did not know defendant Amy "Clumsy" Cabbel, but she had seen Cabbel at Gutierrez's apartment on two occasions close in time to the crimes. Guerrero, Sanchez, and Miranda were present on the occasions when Cabbel was there. Hernandez testified Cabbel's hair had blond-colored highlights.

Miranda testified she had known Cabbel for about two weeks before she was arrested in this case.

3

At trial, Gutierrez initially claimed he did not know Cabbel but admitted the name "Clumsy" sounded familiar. When asked to look around the courtroom, Gutierrez admitted he recognized Cabbel, he "probably used to hang around with her back in the old days," and he had only seen her twice before the trial.

### The party

On the evening of Saturday, June 5, 2010, Gutierrez had a barbeque party at his apartment. Hernandez testified there were about 15 people there, including Guerrero, Sanchez, and Miranda. Everyone was hanging around in the apartment, the back patio, and the carport. They drank beer and used methamphetamine and marijuana.

Miranda testified Cabbel was at the party. Gutierrez testified he could not remember if Cabbel was there. Hernandez testified she did not see Cabbel inside Gutierrez's apartment that night.

### The plan

Hernandez testified that sometime after 11:00 p.m., everyone was still at the party. Guerrero and Sanchez spoke to Hernandez and Miranda inside Gutierrez's living room. Hernandez testified Guerrero told the young women they were going to go to a bar so they could meet men and get money from them. Guerrero said they would get a ride to the bar. Guerrero told Hernandez and Miranda "we were going to go inside, just get some guys and . . . try to get money" by "sweet talking to them."

Hernandez testified Sanchez also said they were going to go into a bar, find men with money, bring the men out of the bar, and Sanchez and Guerrero would beat them up. Guerrero and Sanchez said they would be watching Hernandez and Miranda to make sure nothing bad happened. Sanchez said that he and Guerrero were going to get money from the men once they were outside the bar. Hernandez thought Sanchez said "they were gonna probably just beat 'em up." No one talked about using a gun or a knife. They would divide the money they got from he men.

### Testimony about Gutierrez's knowledge of the plan

Hernandez testified Gutierrez and other people were still at the party when Guerrero and Sanchez spoke to the two young women about the robbery plan, but no one else was talking or listening to them. Hernandez testified she did not know exactly where Gutierrez was during their discussion: "He might have been in the room, I don't know." Hernandez testified Gutierrez did not take part in the discussion, and he did not hear what they were talking about.

At trial, Miranda admitted that when she spoke to the police during the investigation she said that Gutierrez had nothing to do with the crime, and only Guerrero and Sanchez told her about the robbery plan at the bar. However, Miranda testified she lied when she made

these statements because she looked up to Gutierrez and did not want to implicate him, but Gutierrez was involved.

Miranda testified that during the party, Gutierrez was the man who spoke to Hernandez and herself about the plan. He talked to them outside his apartment, while Cabbel and Sanchez were standing by a car. Guerrero was not present. Gutierrez told Miranda and Hernandez to leave with Guerrero, Sanchez, and Cabbel.

According to Miranda, Gutierrez told the two young women that "he needed us to rob . . . these guys." Gutierrez told her to "sweet talk" men in the bar and "see . . . if they can give me money" and drugs, and then they would share the drugs with everyone. Miranda believed the plan was for the young women to flirt with men at the bar to get money from them. Miranda thought they were going to scare the men into giving them money. Miranda testified Gutierrez told her that Guerrero and Sanchez were "going to . . . take care of us and they were going to look out for us."

Miranda testified that she believed Gutierrez knew about the plan because she saw him talking with Guerrero and Sanchez the day before the party, and then he made her leave the party with Guerrero and Sanchez and said "they were going to take care of me, that they know what's up."

Hernandez and Miranda agreed to do it. Hernandez thought "it was going to be easy." Hernandez testified she needed money for her methamphetamine addiction. Miranda understood that she was going to steal from some people at the bar. Hernandez and Miranda decided to give fake names and conceal their identities to whomever they met in the bar.

### Cabbel's car

Guerrero, Sanchez, Hernandez, and Miranda left Gutierrez's apartment. Hernandez testified she told Gutierrez that she was going somewhere and needed someone to watch her child. Gutierrez and another friend stayed at the apartment with the child.

Hernandez testified Guerrero led them to a four-door car that was already in the apartment building's carport. Hernandez testified that Cabbel was sitting in the driver's seat. Hernandez testified Cabbel had not been inside the apartment when they discussed what they were going to do at the bar.

Hernandez testified Guerrero asked Cabbel to give them a ride to the bar. Hernandez, Miranda, and Sanchez got into the back seat. Guerrero got into the front seat and Cabbel drove.

Miranda testified that when she went to the parking lot, Cabbel and Sanchez were already standing by a car. Guerrero and Hernandez joined them. Guerrero got into the front seat, Cabbel was driving, and Sanchez sat in the back with the two young women.

### *Gutierrez's testimony about Cabbel's car*

Gutierrez testified that around 11:30 p.m., Guerrero left the party with Miranda, Hernandez, and Sanchez. Gutierrez and his girlfriend were cleaning the kitchen when they left, and he did not ask them any questions about what they were doing. Gutierrez did not remember if he had a conversation with them before they left, but testified they did not tell him where they were going.

Just after they left his apartment, Gutierrez testified he went outside and saw Guerrero, Sanchez, Hernandez, and Miranda standing by a car in the carport. Gutierrez went upstairs to his girlfriend's apartment and smoked a marijuana joint on the balcony. The four people were standing around the car and talking. He could not see if anyone was sitting in the car. He stayed upstairs with his girlfriend.

### *Cabbel drives to the El Prado Bar*

Hernandez testified Cabbel drove to a gas station and purchased gas, then drove to a bar but did not stop there. At that point, Guerrero talked to Cabbel and told her where to go. Hernandez did not hear anyone tell Cabbel about their plan.

However, Miranda testified that during the drive, Cabbel instructed Miranda and Hernandez to go inside the bar and "take . . . whatever they give us, to take it." Cabbel told the young women to talk to men in the bar, and not refuse if the men offered to buy drinks or drugs. Miranda testified Cabbel told the young women to "[j]ust talk to them. And don't say no, to take whatever they were offering us." Guerrero and Sanchez also told them to go to the bar and get some money. Guerrero and Cabbel were talking during the drive, but Miranda could not hear their conversation because loud music was being played.

Hernandez testified Cabbel stopped at the El Prado Bar. Hernandez testified she got out of the car with Miranda, and no one else got out or talked to them. Hernandez and Miranda walked toward the bar. Hernandez never saw Cabbel again that night.

Miranda testified that when Cabbel stopped at the bar, Sanchez got out of the back seat so Hernandez and Miranda could also get out. Guerrero stayed in the car. Miranda testified that Cabbel told the young women "to go inside this bar," "see what happens," and "to take everything they were offering us." Guerrero and Sanchez did not tell them anything. Miranda testified Cabbel drove to another location and parked by the bar.

### *The victims arrive at the bar*

Philip Flores (Flores) was one of the security guards at the El Prado Bar. He was stationed in the parking lot and charged patrons to park there. His girlfriend, Marie Gonzalez (Marie), was with him that night. Another security guard was stationed at the bar's front entrance to check identifications.

6

Around 10:00 p.m., a green van pulled into the bar's parking lot, and Flores collected the parking fee from one of the occupants. The driver and two other Hispanic males got out of the van and walked to the bar.

The men in the green van were later identified as Jose Jacobo and Juan Gonzalez, the victims in this case, and their friend, Teofilo Mendoza. Jacobo and his friends went into the bar and drank several beers.

### The suspects arrive at the bar

Flores and Marie testified that around midnight, a white or light-colored four-door vehicle stopped on the street in front of the bar's parking lot. Flores believed there were two men and three women in the car. Flores and Marie testified the driver was a light-skinned woman with blond hair. Flores did not collect a parking fee from this vehicle because it stayed on the street and did not turn into the parking lot.

Flores testified two Hispanic men and two Hispanic young women got out of the car; the female driver did not get out. Flores said one man was bald and had tattoos with cursive writing on the right side of his neck. Marie thought only one man got out of the car, and he was bald. Marie testified the two women looked "really young."

Flores testified the two men stood face-to-face with the two young women. Flores testified one man faced the young women and talked to them. Both Flores and Marie heard one man tell the two women to "go try," "go try it," or "go inside and try."

Flores and Marie testified the two young women walked toward the bar's entrance. They lost sight of them and did not see if they went inside. Flores testified the two men got into the car's back seat. The car's driver made a U-turn, pulled into the adjoining neighborhood, and then turned into the alley next to the parking lot.

### The victims meet the young women

There is no evidence that Jacobo and his friends previously knew Hernandez and/or Miranda. Hernandez testified about how she and Miranda met the victims, whom they apparently selected at random. After the young women got out of Cabbel's car, they walked to the bar's entrance and were approached by three Hispanic men who asked if they wanted to party. These men were later identified as Gonzalez, Jacobo, and Mendoza, who had earlier arrived in the green van.

Hernandez accepted their invitation. Hernandez and Miranda tried to get into the bar, but the security guard stopped them because they did not have identifications. The three men walked away and headed to the parking lot.

Hernandez testified she returned to the parking lot with Miranda, and they stayed there for about five minutes. Miranda had a cell

phone, but Hernandez could not remember if she was using it. One of the three men again approached and asked if they wanted to party. Hernandez again said yes. The other two men were waiting at their van, and they walked over to the young women and invited them to their house. Hernandez and Miranda agreed, and got into their green van. They gave false names to the men.

Miranda testified that as they left the bar and walked to the parking lot, she sent a text message to Cabbel telling her that that they had been kicked out of the bar. Cabbel replied that she was "coming to get us." They waited in the parking lot and saw three Hispanic men. Two men approached and one man walked to a van. The two men spoke to Miranda and Hernandez in Spanish. As they spoke with the men, Miranda sent a text message to Cabbel and told her the men wanted the young women to go with them. Cabbel replied that she was looking at them, and it was okay for them to go. Miranda also testified that she called Cabbel and told her about the three men, and Cabbel "told me . . . not to trip, that they got our backs" in case anything happened. Miranda and Hernandez got into the van with the men.

Jacobo and Mendoza also testified about how they met Hernandez and Miranda. As they left the bar with Gonzalez, they encountered two young women outside. One of the women approached and said she wanted to go out and drink beer with them. They talked for about five minutes, and then both women got into Jacobo's van with the three men. The young women sat in the back seat and Jacobo drove away from the bar.

Flores and Marie, who were still working in the parking lot, testified that about 10 to 15 minutes after the two young women arrived, the same two women returned to the parking lot and one woman was texting on a cell phone. A few minutes later, the three men from the green van also returned to the parking lot. One man approached and spoke with the woman who was not using the cell phone, and the other two men went to the van.

Flores testified that after a few more minutes, the two men who were waiting by the van spoke to their companion in Spanish and said, "[C]ome on, let's go." Their companion and the two young women walked to the green van, and everyone got inside and left.

***Cabbel's car follows Jacobo's van***

Hernandez testified she saw Cabbel's car near the bar's parking lot as they left, but she did not know if Cabbel followed the van from the bar. However, Miranda testified that as they left the bar in the van, she saw Cabbel's car following behind them. When the van turned at the corner, Miranda saw Cabbel's car take off in another direction. Miranda was upset and thought "[t]hey left us for dead."

Flores and Marie testified that as the van drove out of the parking lot, they saw the same light-colored vehicle that had earlier dropped off the two young women. The vehicle emerged from a parking spot on the street, the headlights were activated, and it drove

8

directly behind the green van and followed it. The woman with blond hair was driving the vehicle. Flores could not see if anyone else was in the car.

### *Jacobo drives to Mendoza's apartment*

Jacobo testified that as he drove from the bar, the two young women asked the men to buy particular brands of beer. Jacobo drove to a liquor store, but they did not buy anything. He drove to a second liquor store and they bought beer. Jacobo drove to the apartment where Mendoza and Gonzalez lived. Jacobo and Mendoza did not know if the women were using a cell phone while they were in the van's back seat.

Hernandez testified that when they got into the van, the men offered to buy drugs and alcohol for them. Miranda asked for Corona beer and Hernandez said she wanted Pacifico beer. The driver went to more than one liquor store, and the men bought Pacifico and Corona beers. Hernandez testified Miranda was texting on her cell phone during the drive. Miranda testified no one responded to her text messages.

Hernandez testified the driver parked at an apartment, and everyone went inside and drank beer. Miranda and Hernandez testified one man left the apartment, returned with drugs, and they smoked methamphetamine. Hernandez testified everyone spoke in Spanish because the men did not speak English. However, Hernandez and Miranda spoke English to each other. Hernandez and Miranda testified the men made sexual advances to them, and they felt uncomfortable in their apartment.

Jacobo and Mendoza testified everyone was talking and drinking at the apartment. Jacobo and Mendoza noticed one of the young women was using a cell phone. The women said they wanted some drugs. Gonzalez and the women left, and they returned with drugs. Jacobo did not know what kind of drugs they were smoking.

### *Jacobo and Gonzalez drive to the alley*

Jacobo and Mendoza testified that as the evening continued, one woman was on a cell phone, and then both women said they wanted to leave and mentioned something about a baby. One woman was crying. Jacobo and Gonzalez agreed to drive both women home. Mendoza did not go with them because it was very late, and he had too much to drink.

Jacobo testified he left the apartment with Gonzalez and both women. They got into Gonzalez's two-door car. Gonzalez was driving. Jacobo identified Hernandez as the woman who sat in the front passenger seat, and Miranda sat in the backseat with him. Jacobo testified the woman in the front seat (Hernandez) told Gonzalez where they wanted to go. He did not recall if either woman used a cell phone when they were in Gonzalez's car.

Hernandez testified that she asked to leave the men's apartment and said she had to go back to her child. Hernandez and Miranda left with two men; the third man did not go with them. They got into a different car, and one of the men (Gonzalez) drove. Hernandez sat in the front passenger seat, and Miranda and the other man (Jacobo) sat in the back seat. Miranda testified the man in the back seat made sexual advances toward her.

Hernandez testified Miranda used her cell phone while they were in the car. Hernandez testified Miranda spoke to her in English and gave her directions. Hernandez translated Miranda's directions into Spanish, and told the driver to go to the west side of Fresno, toward Food Maxx, and then directed him to turn into an alley near the store, based on Miranda's directions.

Miranda testified that when she was in the man's car, she spoke to Cabbel who told her to "go west" and "park by the Park." Miranda told Hernandez to have the men "drop us off at the west" and "park by the Park" because they were going back to Gutierrez's apartment.

### The attack in the alley

Hernandez and Miranda testified the driver parked in the alley. Hernandez was familiar with the alley because it was very close to Gutierrez's apartment. Hernandez did not see anyone else in the alley.

Jacobo testified Gonzalez drove into an alley and both women said, "[T]his is it." Gonzalez stopped the car, and the woman in the front passenger seat got out. Jacobo testified that Gonzalez got out of the driver's side door.

Hernandez testified the two men did not want them to leave. Hernandez and Miranda turned away from the car and started to walk toward Gutierrez's apartment.

Jacobo testified that as he got out of the back seat, a man was "already there and [he] grabbed me by my hand" and pulled him out of the car. The man spoke Spanish and told Jacobo that he wanted his wallet. Jacobo told the man to wait for a little bit until he took out his wallet. Jacobo testified he was very drunk and had trouble reaching for his wallet. He tried to "loosen" himself from the man.

Jacobo realized a second man was standing by Gonzalez. Both suspects were Hispanic. Jacobo did not know where the men came from, and he did not notice what happened to the young women. The second suspect hit Gonzalez in the head. The first suspect attacked Jacobo. Jacobo tried to kick him, but he was too drunk to defend himself. The first suspect stabbed Jacobo with a knife. Jacobo fainted, he never heard a gunshot, and he did not see what the second suspect did to Gonzalez.

Hernandez testified she was walking away from the car when she heard Sanchez say, "Give me the money" in Spanish. Hernandez turned around and looked back at Gonzalez's car. She saw Sanchez and Guerrero struggling with the two men. Hernandez testified Guerrero had a gun. Hernandez heard the victims say "no," and they refused to turn over their money.

Hernandez testified Guerrero and Sanchez told the young women to run. Hernandez and Miranda started to run toward Gutierrez's nearby apartment. Hernandez heard a gunshot. Hernandez turned around and looked back at the car. She saw Guerrero hit one man in the back of the neck, above the shoulders, and the man "just dropped" down. This man was later identified as Gonzalez. Guerrero pointed the gun at something, possibly the man he hit in the back.

Miranda testified she got out of the car, told Hernandez they were leaving, and started to walk out of the alley toward Gutierrez's apartment. She saw Sanchez in the alley with the man who had been sitting in the backseat with her, later identified as Jacobo. The man was on his knees. Sanchez told the man to turn over his wallet and everything he had. The man seemed to be reaching for his wallet, and Sanchez kicked him more than once.

Miranda turned away from the car. She heard a gunshot, turned around, and saw the driver (Gonzalez) on the ground. Miranda initially testified she did not see the face of the second suspect, but he was wearing the same sweater which Guerrero had been wearing. However, Miranda eventually testified that Guerrero was in the alley, he was standing by the driver, and he hit the driver with something. Sanchez told her to run. She grabbed Hernandez's hand, and they ran to Gutierrez's apartment. Hernandez fell down and scraped her arm and knee, and then she got up and kept running.

### *Miranda and Hernandez return to Gutierrez's apartment*

Hernandez testified that when they got back to Gutierrez's apartment, she did not see anyone, and the party guests were gone. Hernandez went into the bedroom and checked on her child. Miranda stayed outside the apartment. Hernandez changed her clothes because she got dirty when she fell down.

Miranda testified she saw Cabbel outside Gutierrez's apartment. Miranda went inside, and Gutierrez and Guerrero were there. Sanchez was in the kitchen and washing blood off his hands. Miranda cursed Sanchez and Guerrero, and told them they were stupid. She was mad because "everything happened so fast and . . . they never told us they were going to use a gun or stuff like that." Gutierrez later told her to be quiet about everything and keep him out of it.

Miranda went outside and saw the victim's car in the carport. About an hour later, Miranda saw Gutierrez drive away in the victim's car.

*Gutierrez's testimony about after the shooting*

Gutierrez testified that he was in his girlfriend's upstairs apartment when he heard "a big commotion outside, like arguing." He ran outside and it was still dark. Gutierrez testified Miranda and Sanchez were in the carport. Miranda was arguing and cursing Sanchez, and kept asking him in Spanish, "Why? Why?" Guerrero and Hernandez were running from the alley to Gutierrez's apartment.

Gutierrez testified there was a small car in the carport, near where Miranda and Sanchez were arguing. Gutierrez testified he did not recognize the car, and it had not been there during his party. The driver's door was open, and he could not see anyone inside it. Gutierrez thought it was probably a stolen car. This car was later identified as Gonzalez's vehicle, which had been parked in the alley during the robbery and murder.

Gutierrez returned to his apartment and there were still two or three people there from his party. Hernandez and Miranda ran inside and were "just going all hysterical and crazy." He tried to ask what happened, but they did not respond. Everyone was "just like tripping out." Sanchez ran into the bathroom, Guerrero went into a bedroom, and the young women were crying in the living room. Gutierrez again asked the young women what happened, but things were "all crazy" and they didn't explain.

Gutierrez testified Sanchez emerged from the bathroom and said "something had happened," and he was going to leave. Gutierrez kept asking Sanchez what happened. Sanchez said he would tell him later.

Gutierrez testified the young women went into their bedroom, and he heard "banging" and things being thrown around. When they walked out of the bedroom, they had changed their clothes. Gutierrez thought that he had seen a dark red stain on one young woman's skirt before they changed.

Gutierrez went to the bedroom to speak to Guerrero, who was taking off his shirt and black sweater. Guerrero looked "very pissed," and Gutierrez decided to leave him alone.

Gutierrez went back to Sanchez and asked what happened. Sanchez was changing his clothes. He said in Spanish, "that they had did this hit and that they had hit this—he said—he said 'pisa' at the time, so he said that—that it was an accident." Gutierrez testified the word "pisa" meant "Mexican." Gutierrez again asked Sanchez what happened. Sanchez "wasn't really telling me like a lot of things." Sanchez was putting clothes in a bag and said he was leaving.

Gutierrez went upstairs to his girlfriend's apartment and talked to her about the situation. His girlfriend said he had to find out whether the car was stolen and get rid of it.

Gutierrez returned to his apartment. A few party guests were still there, but Guerrero, Sanchez, and one of the young women were gone.

### *Gutierrez moves the victim's car*

Gutierrez testified that around sunrise, he went to the carport and moved the car that he believed was stolen. The driver's door was still open and the interior light was on. The ashtrays were pulled out, the glove compartment was open, and the center console was flipped open. The stereo had been pulled out and wires were dangling. There were insurance documents and other papers spread inside and outside the car. Gutierrez picked up some of the papers and threw them into his nearby trash can. Gutierrez thought the keys were in the car because he tried to start it, but the battery was dead. Gutierrez shifted the car into neutral, pushed it to Modoc Street, and left it there. He spent the rest of the night at his girlfriend's apartment.

### *THE INVESTIGATION*

Jacobo testified that he woke up in the alley, and realized he had been stabbed and he was bleeding. Gonzalez was lying on the ground next to him. Jacobo tried to talk to him, but Gonzalez was not responsive. Jacobo walked out of the alley and onto the street to find help.

At 3:33 a.m. on June 6, 2010, Sergeant Richard Brown received a dispatch about a suspicious person in the area of Stanislaus and B Streets. At 3:36 a.m., Sergeant Brown arrived in the area and found Jacobo walking in the street. Jacobo had several stab wounds, and his clothes were soaked in blood. Jacobo told Sergeant Brown that he and his friend had been assaulted in the area. Jacobo's wallet, and the money and papers inside it, were not taken from him during the assault in the alley.

Sergeant Brown looked in the vicinity for Jacobo's friend. The police received information about a subject lying in a nearby alley, about four blocks from the location where Jacobo had been found. Brown responded to the alley and found Juan Gonzalez lying face up on the ground. He was dead from a gunshot wound to the head. The police did not see a vehicle in the alley.

Jacobo suffered multiple stab wounds to the left side of his chest, waist, left arm and hand. He was in the hospital for one week and survived his injuries. He returned to the hospital several times for additional operations. He had nerve damage to his left arm and permanent injury to his left hand.

The pathologist determined Gonzalez had been shot in the back of his head, and he died within several minutes. There were no signs of stippling or gunpowder around the entrance wound, which indicated the gun barrel was not directly on his skin. There was no evidence the fatal wound was inflicted by a shotgun. Gonzalez also had abrasions on his left cheek below the eye and on the left

forehead, which showed a particular pattern from whatever was used to inflict the injuries. The facial injuries were inflicted around the same time as the fatal head wound. There were no defensive wounds. Gonzalez's blood and urine tested positive for alcohol, methamphetamine, and amphetamine.

### The crime scene

At 6:00 a.m., Detective Jennifer Federico arrived in the dirt alley where Gonzalez's body was found. Both entrances to the alley were blocked with crime scene tape. A wallet was lying on the ground, about a foot and a half away from Gonzalez's body. There was no money in the wallet.

There was a nine-millimeter Lugar expended cartridge case on the ground, about a foot from Gonzalez's body. There were fresh shoe tracks and bloody shoe prints in the dirt. A Corona beer bottle and a broken bottle of Pacifico beer were in the vicinity of the body.

There was a trail of blood drops that led from the alley, into the street, and along the fence at the park which was adjacent to the alley. The blood trail ended on the street where Jacobo was found.

### The victim's apartment

The investigating officers went to Gonzalez's apartment and found empty beer cans and bottles throughout the interior, including those for Pacifico, Corona, and Tecate. A homemade device used to smoke methamphetamine was on the couch. Jacobo's green van was parked near Gonzalez's apartment complex. There were empty Tecate beer cans and Corona beer bottle caps inside in the van.

### Gutierrez and the Nike shoes

Around 9:00 a.m., as the officers investigated the alley where Gonzalez's body was found, Gutierrez testified he left his girlfriend's apartment and went downstairs to his own apartment. He grabbed his wallet because he was going to the store. He looked inside one of the bedrooms and one of the young women was asleep. No one else was there.

Gutierrez testified he had been wearing some "nice dress shoes" at the party. He also testified that when he returned to his apartment around 9:00 a.m., he was wearing "some brown Lugz" shoes.

Gutierrez testified he owned three or four pairs of shoes, including a pair of white Nike Air Jordans, which did not have laces. He had last worn the Nike shoes two days before the party. Gutierrez testified that when Guerrero moved into his apartment, he allowed Guerrero to borrow his shirts, socks, and shoes because Guerrero did not have any money or clothes to wear.

Gutierrez testified that as he left for the store, he took off his "slippers" and put on the Nike shoes, which he had left outside the front door next to the doorstep. He had left the shoes at the door

because he used them "for yard clean up, like yard shoes." He did not notice anything unusual about the Nikes or see any blood on the shoes. However, Gutierrez subsequently admitted that he noticed stains on the shoes and tried to wash them off with a hose.

After he put on the Nike shoes, Gutierrez and his girlfriend walked to the store. He bought "a Smirnoff" and some chips and candy.

### Discovery of the victim's car

At 1:00 p.m., the investigating officers found Gonzalez's silver two-door Mercury Cougar on Modoc Street near East Amador. The car was about two blocks from the alley where Gonzalez's body was found, and where he had parked the car to drop off the young women. The stereo was missing and the wires were hanging from the dashboard. However, the car's interior was unusually clean, as if it had just been cleaned out.

It was later determined that Miranda's right palm print was on the car's exterior, on the rear roof of the driver's side.

### Initial contact with Gutierrez

After they found the victim's car, Detective Federico and other officers walked around the neighborhood, looked through trash containers, and hoped to find something connected to the vehicle. They ended up at Gutierrez's apartment complex on East Amador, which was less than 100 yards away from the location of the victim's car.

Detective Federico looked around the outside of the apartment and carport area. There were beer bottles, chairs, and a barbeque grill in the carport, as if there had been a party. Federico looked in the grill and did not see anything unusual. Federico noticed the beer bottles were the same brand as those in the alley where the victim's body was found.

As the officers looked around the outside of the apartment complex, Gutierrez and his girlfriend returned from the store. Gutierrez was carrying an open container of vodka. He was wearing a black T-shirt, white shorts, and black and white shoes without laces.

Detective Federico questioned Gutierrez about the open container. Gutierrez also had a small amount of marijuana. Federico asked if he had a party the previous night. Gutierrez acted nervous. He was vague and hesitated to give any information. He said he had a gathering and spent the night at his girlfriend's apartment. Gutierrez said he lived by himself in his apartment.

Detective Federico asked Gutierrez to sit down, and she noticed the chevrons on the soles of his Nike shoes were similar to the shoe prints in the dirt alley near the victim's body. Another detective noticed possible blood stains on top of the shoes.

15

Detective Federico determined Gutierrez had outstanding misdemeanor warrants. He was taken downtown because of the warrants and for an interview. During the interview, Gutierrez admitted he had a party but gave false names for his friends. Gutierrez again said he lived alone. Gutierrez was asked if he saw anything unusual in the middle of the night. He said there were two guys driving in the alley around 3:00 a.m.

Detective Federico testified that at the time of this interview, she did not know if there was blood on Gutierrez's shoes or who it matched. However, she went by her "gut instinct" and told Gutierrez that the victim's blood was on his shoes. Gutierrez said he had cleaned off the shoes that morning.

After the interview, Gutierrez was taken to jail, and then cited and released. The police seized the white Nike shoes.

### Guerrero and Sanchez leave Gutierrez's apartment

Gutierrez testified that that after he was cited and released, he returned to his apartment and no one was there. Later that afternoon, however, Guerrero reappeared at the apartment. Gutierrez asked him what happened. "[Guerrero] told me that he was sorry" and "he didn't meant to do it," and then "got to telling what went on."

Gutierrez testified he "blew up," cursed Guerrero, and asked "why you guys do that for . . . I live right here, you know, I—I helped you guys, you know, and for you guys to do this shit to me, you know, and I thought you guys were my homeboys . . . ." Guerrero said he was sorry and "he didn't mean to—it wasn't supposed to happen," and "he started fighting."

Gutierrez testified that he saw Guerrero using his barbeque grill, which had been moved to the back patio. Guerrero was burning a sweater on the grill. Guerrero did not explain what he was doing and Gutierrez did not ask, but he "kind of figured" why he was doing it. Gutierrez testified Guerrero later left the apartment. Gutierrez looked in Guerrero's bedroom and all of the clothes were gone, including those that Gutierrez had loaned to him.

Rosalina Gonzalez, Gutierrez's neighbor, testified that on Saturday night, June 5, 2010, she heard gunshots. On Sunday afternoon, June 6, 2010, she saw the police walk around Gutierrez's apartment, take photographs, and collect bottles and cans. After the police left, she saw Sanchez walk out of the apartment complex's front gate. He was carrying a bag of clothes. Shortly afterwards, Guerrero walked out of the same gate and also had a bag of clothes. She asked Guerrero if he was going to do the laundry. Guerrero replied, "No, I'm leaving." He got into a car and left with some young women.

16

*Search of Gutierrez's apartment*

On or about June 7, 2010, the officers executed a search warrant at Gutierrez's apartment. They found men's and women's clothes, baby items, photographs of Hernandez and another young woman, and paperwork in the names of Hernandez, Miranda, Guerrero, and Gutierrez. They also found clothes that appeared to have blood on it.

The registration paperwork for Gonzalez's car was found in a hallway closet. The officers also found a sawed-off shotgun in the patio area, and .22–caliber shells in the apartment. There were several knives in the kitchen and one knife in a bedroom. There was no evidence of blood on the knives.

The officers examined the barbeque grill on the back patio. They found ashes from burnt clothing in the grill. The ashes were not present when they initially saw the grill in the carport area the previous day.

*Gutierrez's subsequent statements*

After the search, Gutierrez was arrested for possession of an illegal weapon. Gutierrez was again interviewed and confronted with the discovery of the shotgun, clothes that appeared bloody, and the victim's vehicle registration. Gutierrez was told the evidence pointed to him. Gutierrez said he got into a fight in the alley with someone and cleaned up in the bathroom.

Gutierrez later said something happened that night, he was upset about it, and he pushed a car away because the keys were missing. Gutierrez also said someone moved the car to East Modoc in the middle of the night. Gutierrez said two people named "Mousie" and "Pelon" had been staying at his apartment, they were gone in the morning, and he had not seen them since. Gutierrez said the Nike shoes did not belong to him, they had been "left" at his apartment, and he found them outside the front door.

Gutierrez eventually told the officers that "Mousie" Guerrero, "Pelon" Sanchez, Hernandez, and Miranda were at his apartment that night, they left together, and they later returned. Gutierrez also said the Nike shoes belonged to him. He noticed there was blood on the shoes, and he cleaned the blood off the shoes with a water hose because he did not want people to see him walking around with bloody shoes. He did not know they were involved in that kind of serious offense, and he did not want anyone else to get in trouble. Gutierrez said he initially did not want to identify anyone because of his lifestyle, and he did not want to be a snitch. Gutierrez said he was not involved in killing anyone, and he was upset that everything got put on him.

*Miranda's pretrial statements*

On June 11, 2010, Miranda was interviewed at the police department. Detective Federico asked Miranda what "you guys

decided to do." Miranda replied that "they told us . . . to go and 'hila'—that means a job in Spanish—'some guys.'" Miranda said they were supposed to "[g]o dance with some guys . . . like go kick it with them, and whatever, you know, and hit 'em up . . . when they were right there." Miranda was asked if they "were going to jack 'em?" Miranda replied, "I guess." Miranda also said, "[T]hey just want us to talk to some guys and, you know, to bring 'em right out there and whatever . . ." and "like to steal." Miranda thought they were just going to "beat up the guys for money."

Miranda said that when they got into the green van, she was texting with Cabbel and "they said, 'yeh, we're following you, you know, we're behind you.'" Miranda lost sight of Cabbel's car and again texted her, but did not receive a response.

Miranda was asked about whether she was texting when the men drove them from the apartment to the alley. Miranda said she received a text for the men to drive to the west side by the park: "Clumsy [Cabbel] told her Mousie [Guerrero] told her that we're going back to the West." Miranda also said that Sanchez sent her a text with driving instructions.

Miranda said when they arrived in the alley, she got out of the car and saw Guerrero and Sanchez. Guerrero went directly to the driver (Gonzalez) and Sanchez walked up to the passenger (Jacobo). Either one or both men told Miranda and Hernandez to run. Guerrero hit the driver with a gun in the back of the neck. She said the weapon was a faded black color, and it was possibly a .40–caliber gun. Miranda heard a gunshot and the driver went down.

On June 14, 2010, Miranda was again interviewed. She said that she was in the bar's parking lot with Hernandez, and they were picked up by three Hispanic men. They got into the van, and she sent a text message to Cabbel to let her know they were in the van. Miranda said Cabbel sent her a text message that she knew where they were, and "they were watching them." Miranda said she did not see where Cabbel was parked. Miranda was asked how she knew Cabbel was texting her. Miranda said she was not sure who was texting her, but she knew the source was either Cabbel, Guerrero, or Sanchez. However, Miranda thought Sanchez was the only person who had a cell phone. Miranda said that around 2:30 a.m., she received a text message from Sanchez that directed her to bring the victims west to the park.

### *Hernandez's pretrial statement*

On June 13, 2010, Hernandez was arrested. The police noticed she had scabs on her arm and knee. Hernandez said she went to a bar with another woman to "sweet talk" some men. They gave false names to some of the men they met. She said the men took her to an alley and the suspects were there. Hernandez said she did not know who the suspects were, and she did not implicate anyone.

Hernandez asked Detective Federico what kind of charges she faced. Federico replied that she could face the death penalty.

Hernandez was surprised that it was serious. Federico gave Hernandez her business card and encouraged her to call her with any information. Hernandez was booked into jail after the interview.

On June 14, 2010, Hernandez called Detective Federico from jail and agreed to another interview. Hernandez was shown photographs and identified Cabbel, Guerrero, Sanchez, and Gutierrez as people who may have been involved. However, she did not say that Gutierrez was involved in any way in the homicide. She gave a false name for Miranda. Hernandez said she did not see the faces of the suspects in the alley, but she thought the men were Guerrero and Sanchez.

### The other suspects

On June 18, 2010, Cabbel was arrested. She had brown hair with blond streaks. Cabbel disclosed the cell phone numbers for herself and her boyfriend, and what she thought was his home telephone number.

On June 19, 2010, Guerrero was arrested in Washington state. His head was shaved and he had tattoos in cursive writing on both sides of his neck, which were clearly visible.

Sanchez was never found.

### Forensic evidence

As noted above, it was stipulated that, based on DNA testing, the police later learned that Gonzalez's blood was found on the outside of one of the Nike shoes that Gutierrez was wearing that morning, and Gutierrez's DNA was on the inner tongue of both shoes.

### The cell phone records

As explained above, Sergeant Brown received a dispatch at 3:33 a.m. on June 6, 2010, about a suspicious person in the area of Stanislaus and B Streets. At 3:36 a.m., Sergeant Brown arrived in the area and found Jacobo, who was critically wounded and reported the attack. A short time later, Brown found Gonzalez's body in the alley.

The prosecution introduced the records from Gonzalez's cell phone, which showed that numerous calls were place to and from his cell phone starting at 3:11 a.m. on June 6, 2010, and continuing to June 7, 2010. There were calls from Gonzalez's cell phone to Cabbel's cell phone at 3:11 a.m., 3:26 a.m., 3:31 a.m. and 3:32 a.m. There were calls from Gonzalez's cell phone to the cell phone of Cabbel's boyfriend at 3:36 a.m., 3:38 a.m., and 4:16 a.m. There were six calls from the cell phone of Cabbel's boyfriend to Gonzalez's cell phone between 4:04 a.m. and 5:32 a.m., and another at 8:20 a.m. At 9:11 a.m., there was a call from Gonzalez's cell phone to a number that was similar to the number which Cabbel thought was her boyfriend's home number.

***GUERRERO'S DEFENSE EVIDENCE***

Neither Guerrero nor Cabbel testified at trial.

Guerrero presented evidence from Gary Harmor, a forensic serologist, who examined the Nike shoes which Gutierrez was wearing. There was DNA on the inner tongue portion of both shoes from two or more people. He determined Gutierrez was the major contributor to the DNA profile. Guerrero was absolutely excluded as a source. Harmor testified a person's DNA will remain in shoes which that person wore until the shoes are thoroughly washed. If the outside of the shoes had been washed with a hose, the DNA would slightly degrade but still remain.

There were at least two and maybe more DNA profiles on the inside of the right shoe's tongue; and at least three and maybe more DNA profiles on the inside of the left shoe's inner tongue.

If a person wore clean socks and then put on the shoes, that person's DNA would not have transferred to the shoes as long as the socks were not soaked with perspiration. Harmor believed that a person would leave DNA even if that person wore socks and shoes in the summer since perspiration would happen fairly quickly.

There was mold on the shoes when they were delivered to Harmor's laboratory. The mold was consistent with moisture, and DNA will degrade as a result of prolonged contact with moisture.

*People v. Guerrero*, No. F066730, 2015 WL 4555562, at \*1-16 (Cal. Ct. App. July 28, 2015).

## II. Discussion

A federal court may grant habeas relief when a petitioner shows that his custody violates federal law. *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75 (2000). Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition. *See* § 2254; *Harrington v. Richter*, 562 U.S. 86, 97 (2011); *Woodford v. Garceau*, 538 U.S. 202, 206-08 (2003). To decide a Section 2254 petition, a federal court examines the decision of the last state court that issued a reasoned opinion on petitioner's habeas claims. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court reviews the state court's decision under the deferential standard of Section 2254(d). Section 2254(d) precludes a federal court from granting habeas relief unless a state court's

decision is (1) contrary to clearly established federal law, (2) a result of an unreasonable application of such law, or (3) based on an unreasonable determination of facts. *See* § 2254(d); *Murray v. Schriro*, 882 F.3d 778, 801 (9th Cir. 2018). A state court's decision is contrary to clearly established federal law if it reaches a conclusion "opposite to" a holding of the United States Supreme Court or a conclusion that differs from the Supreme Court's precedent on "materially indistinguishable facts." *Soto v. Ryan*, 760 F.3d 947, 957 (9th Cir. 2014) (citation omitted). The state court's decision unreasonably applies clearly established federal law when the decision has "no reasonable basis." *Cullen v. Pinholster*, 563 U.S. 170, 188 (2011). An unreasonable determination of facts occurs when a federal court is "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Loher v. Thomas*, 825 F.3d 1103, 1112 (9th Cir. 2016). A federal habeas court has an obligation to consider arguments or theories that "could have supported a state court's decision." *See Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2557 (2018) (quoting *Richter*, 562 U.S. at 102). On all issues decided on the merits, the petitioner must show that the state court's decision is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

Even when a state court does not explicitly address a petitioner's claims on the merits, a Section 2254 petitioner must satisfy a demanding standard to obtain habeas relief. When a state court gives no reason for denying a petitioner's habeas claim, a rebuttable presumption arises that the state court adjudicated the claim on the merits under Section 2254(d). *See Richter*, 562 U.S. at 99. And a federal habeas court's obligation to consider arguments or theories that could support a state court's decision extends to state-court decisions that offer no reasoning at all. *See Sexton*, 138 S. Ct. at 2557.

If a state court denies a petitioner's habeas claim solely on a procedural ground, then Section 2254(d)'s deferential standard does not apply, *see Visciotti v. Martel*, 862 F.3d 749, 760 (9th Cir. 2016), but the petitioner faces another hurdle: if the state court's decision relies on a state procedural rule that is "firmly established and regularly followed," the petitioner has

procedurally defaulted on his claim and cannot pursue habeas relief in federal court unless he shows that the federal court should excuse his procedural default. *See Johnson v. Lee*, 136 S. Ct. 1802, 1804 (2016); *accord Runningeagle v. Ryan*, 825 F.3d 970, 978-79 (9th Cir. 2016). If the petitioner has not pursued his habeas claim in state court at all, the claim is subject to dismissal for failure to exhaust state-court remedies. *See Murray v. Schriro*, 882 F.3d 778, 807 (9th Cir. 2018).

If obtaining habeas relief under Section 2254 is difficult, "that is because it was meant to be." *Richter*, 562 U.S. at 102. As the Supreme Court has put it, federal habeas review "disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Id.* at 103 (citation omitted). Our habeas review authority serves as a "guard against *extreme* malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102-03 (emphasis added).

Here, petitioner raises four habeas claims: (1) the trial court failed to include the word "accomplice" in certain jury instructions, thereby precluding the jury's finding that Gutierrez was an accomplice whose testimony required corroboration under California law; (2) Article VI Section 3 of the California Constitution governed whether the error in failing to give proper the jury instructions resulted in prejudice for petitioner; (3) the trial court's error in failing to provide the proper jury instructions violated petitioner's rights under the Fifth, Sixth, and Fourteenth Amendments of the U.S. Constitution; and (4) petitioner received ineffective assistance from his trial counsel because his attorney failed to object to the trial court's failure to provide proper jury instructions. *See* ECF No. 1 at 5-10. On direct appeal, the Court of Appeal rejected all these claims on the merits. The California Supreme Court summarily denied review.

All four habeas claims depend on one issue: whether the trial court erred by omitting the word "accomplice" in various parts of the jury instructions—as petitioner argues in Ground One. Grounds Two and Three concern what law should apply to Ground One. Ground Four matters only if the trial court erred by omitting the word "accomplice" in the jury instructions challenged by petitioner. Petitioner's central premise—that he is entitled to federal habeas relief based on

the state trial court's errors in the jury instructions—is flawed for two simple reasons: federal law does not require corroboration of accomplice testimony, and even if it did, any error would have been harmless in this case.[2]

### a. Accomplice Testimony under Federal Law

At trial, the government presented three key witnesses: Princess Hernandez, Sonia Miranda, and Francisco Gutierrez. The trial court instructed the jury that Hernandez and Miranda were accomplices as a matter of law and that, to support petitioner's conviction, the testimony from these individuals required independent corroboration. As for Gutierrez, the trial court instructed the jury that whether he was an accomplice was a question of fact for the jury to decide. On direct appeal, the Court of Appeal concluded that the trial court gave a "sufficient" jury instruction that allowed the jury to decide whether Gutierrez was an accomplice. *Guerrero*, 2015 WL 4555562, at *28. In this habeas proceeding, petitioner argues that some of the jury instructions erroneously omitted the word "accomplice"; that, but for this error, the jury would have found that Gutierrez was an accomplice whose testimony required corroboration; and that without the requisite corroboration for Gutierrez's testimony, the guilty verdict cannot stand.

Under California state law, uncorroborated accomplice testimony cannot support a conviction, but this state law rule does not implicate any federal right. *See Barco v. Tilton*, 694 F. Supp. 2d 1122, 1136 (C.D. Cal. 2010). Indeed, uncorroborated accomplice testimony can support a conviction under federal law. *See id.* (collecting cases); *United States v. Ramirez-Robles*, 386 F.3d 1234, 1245 (9th Cir. 2004) ("[U]ncorroborated testimony of a co-conspirator is sufficient to uphold a conviction."); *Cornwell v. Warden, San Quentin State Prison*, No. 06-cv-705, 2018 WL 934542, at *136 (E.D. Cal. Feb. 15, 2018) ("As the Ninth Circuit has explained, California's statutory law prohibiting convictions based solely on uncorroborated accomplice testimony is only a state law rule: it is not required by Constitution or federal law."); *cf. United States v. Augenblick*, 393 U.S. 348, 352 (1969) ("When we look at the requirements of procedural due

---

[2] It appears that this case should not have survived preliminary screening, given petitioner's failure to identify any violation of federal law—despite his general, vague references to the United States Constitution.

1    process, the use of accomplice testimony is not catalogued with constitutional restrictions.").

2 Because a federal district court does not review errors of state law, a challenge to jury instructions

3 based on the rule of California law that requires corroborated accomplice testimony does not state

4 a cognizable federal habeas claim. *See Barco*, 694 F. Supp. 2d at 1136.

5       Here, petitioner states no cognizable habeas claim under federal law. Although petitioner

6 states in passing that the trial court's errors in its jury instructions violated his rights under the

7 Fifth, Sixth, and Fourteenth Amendments of the United States Constitution, ECF No. 1 at 47, his

8 appeals to those broad constitutional principles do not raise federal claims. *See Gray v.*

9 *Netherland*, 518 U.S. 152, 163 (1996); *Casey v. Moore*, 386 F.3d 896, 913 (9th Cir. 2004). Only

10 a holding from the United States Supreme Court can establish a clearly established federal law,

11 *see Atwood v. Ryan*, 870 F.3d 1033, 1046 (9th Cir. 2017), and petitioner has identified none.

12       **b. Effect of Alleged Error on Trial's Outcome**

13       Even if petitioner had stated a cognizable habeas claim under federal law, any error here

14 would be harmless. The standard from *Brecht v. Abrahamson*, 507 U.S. 619 (1993), governs our

15 harmless-error inquiry. *See Dixon v. Williams*, 750 F.3d 1027, 1034 (9th Cir. 2014) (per curiam).

16 Under *Brecht,* a petitioner can obtain federal habeas relief only if "the error had substantial and

17 injurious effect or influence in determining the jury's verdict." 507 U.S. at 637. To satisfy this

18 standard, the court must have "grave doubt" as to the outcome, meaning that "in the judge's mind,

19 the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of

20 the error." *See O'Neal v. McAninch*, 513 U.S. 432, 435 (1995).

21       Here, we do not see any basis for grave doubt that the trial's outcome would have been

22 different. Petitioner does not argue that the following jury instructions contain any error:

23           Before you may consider the statement or testimony of Francisco
Gutierrez as evidence against the defendants regarding the crime of

24           conspiracy to commit robbery, robbery, or attempted robbery, *you
must decide whether Francisco Gutierrez was an accomplice* to that

25           crime. A person is an accomplice if he or she is subject to
prosecution for the identical crime charged against the defendant.

26           Someone is subject to prosecution if:

27              1. He or she personally committed the crime;

28

Or 2. He or she knew of the criminal purpose of the person who committed the crime;

And 3. He or she intended to, and did in fact, aid, facilitate, promote, encourage, or instigate the commission of the crime or participate in a criminal conspiracy to commit the crime.

The burden is on the defendant to prove that it is more likely than not that Francisco Gutierrez was an accomplice.

A person may be an accomplice even if he or she is not actually prosecuted for the crime.

If you decide that a declarant or witness was not an accomplice, then supporting evidence is not required and you should evaluate his or her statement or testimony as you would that of any other witness.

*If you decide that a declarant or witness was an accomplice, then you may not convict a defendant of conspiracy to commit robbery, robbery, or attempted robbery, based on his or her statement or testimony alone.* You may use the statement or testimony of an accomplice to convict the defendant only if:

1. *The accomplice's statement or testimony is supported by other evidence that you believe*;

2. *That supporting evidence is independent of the accomplice's statement or testimony*;

And 3. *That supporting evidence tends to connect the defendant to the commission of the crime.*

Supporting evidence, however, may be slight. It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crime, and it does not need to support every fact mentioned by the accomplice in the statement or about which the accomplice testified. On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission. The supporting evidence must tend to connect the defendant to the commission of the crime.

The evidence needed to support the statement or testimony of one accomplice cannot be provided by the statement or testimony of another accomplice.

*Any statement or testimony of an accomplice that tends to incriminate the defendant should be viewed with caution.* You may not, however, arbitrarily disregard it. You should give that statement or testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence.

*Guerrero*, 2015 WL 4555562, at *28-30 (emphasis added). The Court of Appeal explained that

these unchallenged jury instructions were "sufficient" for the jury to decide whether Gutierrez was an accomplice. *Id.* at *28. The jury instructions explicitly asked the jury to decide whether Gutierrez was an accomplice, explained what makes a person an accomplice, and explained the kinds of evidence that could corroborate an accomplice's testimony. Petitioner does not argue that the jury instructions above misstated any rule of California law, and we see no error. *See generally People v. Coffman & Marlow*, 34 Cal. 4th 1, 103 (2004) (discussing the correct law on accomplice testimony under California law and what courts should instruct the jury). We conclude that the jury instructions sufficed to prompt the jury to decide whether Gutierrez was an accomplice.

We ordinarily do not address the issues of state law in habeas proceedings, but even if we were to do so, petitioner's arguments would warrant prompt rejection. According to petitioner, the following instructions should have included the term "accomplice" along with the term "defendant":

> To prove that a defendant is guilty of murder, the People must prove that:
>
> 1. The defendant is guilty of conspiracy to commit robbery, robbery, or attempted robbery;
>
> 2. During the commission of the conspiracy to commit robbery, robbery, or attempted robbery, a co-participant in that robbery or attempted robbery, committed the crime of murder;
>
> And 3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of murder was a natural and probable consequence of the commission of conspiracy to commit robbery, robbery, or attempted robbery.
>
> To prove that a defendant is guilty of the crimes charged in Counts 2 and 3 -- that would be the murder, attempt murder charges -- the People must prove that:
>
> 1. The defendant conspired to commit robbery;
>
> 2. A member of the conspiracy committed murder or attempted murder to further the conspiracy;
>
> And 3. Murder or attempted murder was a natural and probable consequence of the common plan or design of the crime that the defendant conspired to commit.

26

The defendants may also be guilty of murder under a theory of felony murder, even if another person did the act that resulted in the death. I will call the other person the perpetrator.

To prove that a defendant is guilty of first degree murder under this theory, the People must prove that:

1. The defendant committed, or attempted to commit, or aided and abetted or was a member of a conspiracy to commit robbery;

2. The defendant intended to commit, or intended to aid and abet the perpetrator in committing, or intended that one or more members of the conspiracy commit robbery;

3. If the defendant did not personally commit or attempt to commit robbery, then a perpetrator, whom the defendant was aiding and abetting or with whom the defendant conspired, personally committed or attempted to commit robbery;

And 4. While committing or attempting to commit robbery, the perpetrator caused the death of another person;

And 5. There was a logical connection between the cause of death and the robbery or attempted robbery. The connection between the cause of death and the robbery, or attempted robbery, must involve more than just their occurrence at the same time and place.

A person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent.

To prove that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:

1. The perpetrator committed the crime;

2. The defendant knew that the perpetrator intended to commit the crime;

3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;

And 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

ECF No. 1 at 179-82. These jury instructions are not the kinds of instructions that would ordinarily include any discussion on the corroboration of accomplice testimony, and the jury instructions would have been confusing if the trial court had adopted petitioner's approach and added the term "accomplice" next to each occurrence of the term "defendant." Petitioner cites no

27

authority supporting his claim of error in the jury instructions.  Indeed, the trial court followed the model jury instructions routinely used in California state courts.  *See* Cal. Jury Instr. Crim. 401, 417, 540B.  The Court of Appeal rejected petitioner's argument, *Guerrero*, 2015 WL 4555562, at *28-30, and we see no basis to grant habeas relief.

### c.  Other Matters

Petitioner identifies the jury instructions as the only errors in this case, so we need not go further.  However, we briefly discuss two other fundamental reasons why petitioner cannot prevail.

First, petitioner mistakenly states that, had the trial court given his version of the jury instructions, the jury would necessarily have found that Gutierrez was an accomplice whose testimony required corroboration.  *See* ECF No. 1 at 169-70.  Such a finding would not have been guaranteed, even if the court had used the instructions now favored by petitioner.  The jury had enough evidence to find that Gutierrez was not an accomplice, as the Court of Appeal explained. *Guerrero*, 2015 WL 4555562, at *27.  Gutierrez testified that he did not know about the conspiracy to commit robbery or the murder that resulted from the conspiracy.  RT 3:593-94, 618-23.  We recognize that some evidence could support a finding that Gutierrez was an accomplice: for example, the police found some blood stains on Gutierrez's shoes, and petitioner's expert testified that the shoes had Gutierrez's DNA but not petitioner's DNA. RT 4:694-98.  However, the DNA evidence was inconclusive.  Petitioner's own expert testified that, if a person wore clean socks and then put on his shoes, that person's DNA ordinarily would not transfer to his shoes absent other factors such as the socks being soaked with perspiration. RT 4:700, 709-10.  The parties do not dispute that Gutierrez often allowed petitioner to borrow his clothing and shoes.  RT 3:593-94.  Given the evidence presented at trial, the jury could have found that Gutierrez was not an accomplice, so petitioner's arguments—all of which assume that Gutierrez was an accomplice—do not entitle him to habeas relief.

Second, the Court of Appeal concluded that even if Gutierrez was an accomplice, the jury had enough evidence corroborating Gutierrez's testimony.  A witness testified at trial that, when he was at a parking lot, a man whose description matched petitioner's gave directions to two

women, saying, "go and try" or "go try it." RT 2:228, 260-61. That testimony, the Court of Appeal explained, sufficed to corroborate Gutierrez's testimony under California law, which required only slight corroboration of accomplice testimony. *Guerrero*, 2015 WL 4555562, at *33-34. We must defer to the state court on an issue of state law. *Woods v. Sinclair*, 764 F.3d 1109, 1138 (9th Cir. 2014). For all these reasons, petitioner cannot prevail, and we thus recommend that the court deny his petition.

## III.     Certificate of Appealability

A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district court's denial of a petition; he may appeal only in limited circumstances. *See* 28 U.S.C. § 2253; *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Rule 11 Governing Section 2254 Cases requires that a district court issue or deny a certificate of appealability when entering a final order adverse to a petitioner. *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997). A certificate of appealability will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires the petitioner to show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, petitioner has not made a substantial showing of the denial of a constitutional right. Thus, we recommend that the court decline to issue a certificate of appealability.

## IV.     Findings and recommendations

As noted above, we recommend that the court deny the petition and decline to issue a certificate of appealability. Under 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California, these findings and recommendations are submitted to the United States District Court Judge presiding over this case. Within fourteen days of the service of the findings and recommendations, any party may file written objections to the findings and recommendations with the court and serve a copy on all parties. That document must be captioned "Objections to Magistrate Judge's Findings and

Recommendations."  The presiding District Judge will then review the findings and

recommendations under 28 U.S.C. § 636(b)(1)(C).

IT IS SO ORDERED.

Dated:   April 16, 2019

UNITED STATES MAGISTRATE JUDGE

No. 202